Good morning, Your Honor. May it please the Court, my name is Thomas Dubs. I'm from the Labaton firm. I represent the Amalgamated Bank, the appellant here, the lead plaintiff below. The Amalgamated Bank owns a mutual fund which it sells units to the public from and it is these shares in that mutual fund which is why they are here today and why they are representing the class. This is a case that is about three numbers and Scienter, indeed two numbers used twice and Scienter. There are three statements that are an issue of February 5th statement that says we feel very much that it's going as expected. A May 7th statement by the Chairman of the Board, nearly all of the employees transferred over from their previous provider and a November 12, 2015 statement by Mr. Caswell, the President saying and the person in charge of the business unit that ran the contract in controversy in London who said we are now reaching a level of recruiting that from a rate perspective is an appropriate level. We feel that we're at the right rate for recruiting. In each one of those statements, there is a number and it is a number that was never made public, was never disclosed that contradicts those statements and when you have a situation where material information is not disclosed that should have been disclosed and contradicts the statements that are made that we submit. What contradicts the nearly all statement? What contradicts that statement? The nearly all? The nearly all statement as well as the first statement are contradicted by the fact that there were 754 health professionals that were planned and assumed to be transferred over from the Otto's company to Maximus during the period of the contract. In fact, 500 were transferred. How do you define nearly all? Well, 750. 500 is the majority. Well, it's about 34-35%. 500 is what the best estimate from Ms. Wolf who ran the operation on the ground in London. 754 is what appears in the assumed number that will be transferred over. Well, what would the number have to be for nearly all not to be misleading in your view? Well, I think over 34 or close to 35% clearly does it. I don't know where nearly all, where the dividing line is. The question under the securities laws is what creates a false impression and a false impression we submit is clearly pled by numbers of this magnitude. Let me just play out this one more thought just because this is an important point of why this difference is not trivial and indeed is critical. Under the contract assumptions, in order for Maximus to make money, it had to have face-to-face assessments of these people who said they could no longer work. They can make paper assessments, but where they got the cash from as a practical matter was the face-to-face assessments. So they needed trained healthcare professionals who knew how to do this in place. And they thought on day one they were going to get 754 and that's what the market thought. It turned out to be 500 or about 254 less. Now what does that add up to? And I grant these are very, very rough. It is not disputed that a trained healthcare professional can do about six of these face-to-face assessments or examinations in a day. So if you have 254, that's 1,500 plus you can do in a day. 7,600 rough numbers you can do in a week. 30,000 you can do in a month. And over 300,000 assessments that you could do in a 10-month year. And what we know is Maximus did do a good job of upping how much they were going to get for each assessment. And the arithmetic is not perfect, but it was 190 pounds, which is about 250 bucks. So if you put all that arithmetic together, what was not there that people thought would be there and reasonable investors thought would be there and assumed would be there was 75 million bucks worth of revenue. And instead of that, they had the 500 and they had to hire, Ms. Wolfe said she had plans to hire 1,000 and they had to train the 1,000 and so on and so forth. And that took some ramp up time. So the key point of this problem is Maximus started from behind the eight ball in a very, very serious way. Well, see, I read this testimony from Ms. Wolfe a little differently. She corroborates that Maximus needed to hire 1,000 more HCPs. But she does not corroborate either the 1,500 or 500 number. Indeed, she seems to concede that she inherited 750. What page are you looking at? Well, I'm looking at a bunch of pages, A, 504, 505. The interview with the Guardian talks about you have to interpolate by doing work to accumulate 1,000 and 1,500. I grant you that. Her testimony is, Your Honor, is looking at the Guardian article as hers. Mr. Phillips is one of the parliamentarians of the Guardian reported a direct quote from you that said it was over 1,000. Leslie Wolfe, at the end of the day, would it be over 1,000? Yes. I said that in my question. Well, if you're asking where does the 1,500 come from, the 1,500 comes from the Guardian report. I'm sorry if I misunderstood it. She said she needed 1,000 and that she was going to start with about 500. So what's missing? Where did she say that? In the Guardian article. Oh, okay. All right. So you have to look at the... I thought you were relying on her testimony. Well, that's one of the things I'm relying on, but I'm relying on... Okay. All right. Her testimony is important, just since we're on it, and then I'll get off of it. That's important because it corroborates what the court below did not focus on, which was that she said it was her who gave the interview to the Guardian and it was accurate. That's really what the That's entitled to be taken as true. And that, we submit, deals with question number one, that it's very much going as expected, and that is unreasonable if 34% less than what you... Oh, that's what you're getting, the 34%, because I still think 500 is nearly all of 754. How is that false or misleading? It's false and misleading because it's a $75 million difference, and that's real money. Uh-huh. I mean, that's one way to look at it. But that's... The other... It's about 75% of 754. Well, it's less than 75. It's 34% transferred over. Oh, okay. Or 34% but not transferred over, excuse me. Yeah, you're using the other number. So, well... So... So the question facing you, I would respectfully submit, is, is this a reasonable... Oh, so that's 76%. The transferred over... You're saying the 34%, where are you getting your 34%? At one point I did the arithmetic of... 500, what's... What's 254... Right. ...of 754. And so 254 of 754 is 34%, you're saying. Right. All right, then, what they did was 76%. I said 75, it's actually 76%. It is nearly all, and that's more real money. Well, yeah, it's more real money, but it's not what it was expected. It's not what they... Well, not yet. Their projection... Were they finished then? Was the contract over then? No, the contract went on for years, and they... So they weren't finished yet. That's true, they weren't finished. The question is, how soon were they going to make money, and where did they start from? And they started from behind the eight ball because they did not have these people transfer, and by the time they could fill that gap, they had to recruit them and train them and so on. So it was a very big deal, and it led to the net effect that they didn't make their earnings that they projected in 15, they didn't make them in 16, and there may be a dispute, but this put the whole project back at least 12 months, if not 18 months or more. And this is how it started. Now, one could say, what's the big deal, 25%, 75%? Well, 25% is clearly material. If I walked in here and said, well, they didn't tell how much money they made by 25% and said that's material, everyone would be nodding. I mean, that's just... 5% is usually the place where you start to argue about materiality. Is there anything in the record that shows that either Caswell or Montoni actually read recruitment reports? We can get the recruitment reports and the data into Reston, Virginia. We cannot get it onto their desk or onto their computer. Okay, so how are we supposed to make a strong impact? It was available to them. There's no question it's available to them, and most importantly... But how are we supposed to make a strong inference based on that it's just somewhere in Reston, Virginia, at their headquarters? Well, I think it's a little more than it's just somewhere in Reston, Virginia. Well, that's because you said it made it to Reston. It made it to Reston, and then there is an inference. We have to remember the work reports were submitted to the British government. These weren't just low-level numbers. It's not just an inference. It has to be a strong inference. I understand. Well, no. Scienter as a whole has to be a strong inference. Not every single little fact has to be a strong inference. We're talking about a holistic analysis. The bottom line is that Leslie Wolf reported to Mr. Caswell. Mr. Caswell, before he goes out and he tells the world and tells investors about his company, he can call her up or send her an email saying, is this right? And there are numerous courts that have held that access to that extent of information, if it's not done, is recklessness. It's not the hardest course I enter intent in the world. We don't contend that. We contend that it's a form of recklessness when you have that degree of access. You also have the additional fact, and this is from the November conference call, where Mr. Montoni extolled the virtues of Mr. Caswell and talked about he was over in London all the time and he knew all about England and he was Mr. England. And I can quote that for you if you want, but that, I would submit, is a fair summary. So there's no question that he had intimate knowledge of what was going on with this contract, which was then the biggest contract in the company. So there is little doubt that you can have an inference that goes up to Montoni and to Caswell based upon their access to information and, in the case of Caswell, his personal involvement in it, which goes beyond just his position. If it was just what was the title on his door, that's not enough. We grant you that. But he went over there and read, in the November conference call, what Mr. Montoni said about Mr. Caswell's knowledge and expertise on this contract, and you have it. Then the third statement is, those first two statements deal with the transfer. The third statement deals with recruiting. The third statement is statement number 11. That's correct. Yes, Your Honor. The third statement is statement 11. We tried to trim the case together. Judge Tringa dealt with all 11. He didn't trim it. He killed it, let's be frank. But statement number 11 by Mr. Caswell, we are now reaching a level of recruiting that, from a rate perspective, is an appropriate level. We feel we're at the right rate for recruiting. The numbers there, and this gives you a broader swing than 34%, is their internal targets were 211 recruit. They needed to recruit a month, and they were recruiting about 100 a month. So they were way behind what they were saying, and they made a statement that suggested that they were in a position that was inconsistent with what was in internal documents repeatedly and was not disclosed to the public. And I'll make one final comment. There are more internal documents in this case than I have ever seen in any one of these cases. We got internal documents from people in Britain who just threw us stuff. So this is not the case of some plaintiff's lawyer dreaming up some theory at 3 o'clock in the morning. Thank you. Thank you. Thank you. May it please the Court. Your Honor, I'd like to actually start with Sienter because I think this Court has had the opportunity to address the question of Sienter many times over the course of the last few decades. And those cases make clear that this is a weak, weak case for Sienter. There are cases where much stronger allegations that pointed to an inference of fraud were still found to not satisfy the high standard under the securities laws for establishing a strong inference of Sienter. For example, the Yates, Matrix, Capil, and McGuire cases all presented much stronger cases of an inference of fraud, and nonetheless, this Court concluded that that was not a sufficiently strong inference. I'd point in particular to the Yates case where the defendant in that case had issued several accounting restatements, had several times missed financial deadlines, had fired its accountants, and multiple CFOs resigned, and there were insiders who had sold respectively 37% and 28% of their holdings, and nonetheless, the Court said this is not a case for a strong inference of Sienter. Similarly, in Matrix Capital, the company had admitted that there was fraud in the regional companies, admitted that there were accounting errors, admitted that there were multiple accounting restatements, admitted that there were rampant red flags, and admitted that the senior management of the company had created a deficient tone at the top, which the Court interpreted to mean explicitly that they had created an atmosphere for insufficient controls. In addition, the Court concluded that there was an inference that there might be a motivation to permit private security sales of over $450 million during the class period, but the Court still concluded that innocent explanations were at least or were more compelling inferences from the facts that were alleged. McGuire similarly had other several factors that permitted some inference of Sienter, but the Court said that these were not strong inferences. The cases go on in other respects, too, to find situations where there are arguments that can be made about Sienter, but the Court rightly weeds out those cases and says this is not a case for a strong inference of Sienter. Cozzarelli, public employees versus Deloitte, the Ottoman case and the teacher's retirement system are all situations where the Court recognized some arguments that would — could support an inference of Sienter, but concluded that this is not a strong case of Sienter. And I'd ask you to look in particular at the Ottoman case, because the parallels between this case and the Ottoman case are really uncanny. In that case, the allegations were that there were too many employee departures. We have the situation where the question is whether there were enough employee recruitments coming in, but they both relate to the number of employees. And in the Ottoman case, the Court noted that the statements in question were general descriptions about the phenomenon of employee departures, not necessarily representations about specific numbers. That's exactly true of this case. So if you look at Statement Number 11, you have Statement Number 11 in front of you, or the third one. Yes. However, we're characterizing it right now. So what is your argument with respect to it? Statement Number 11 needs to be taken in its full context. And if you read the full context, the company, the speaker in that case, explains in great detail what the phenomenon was. Well, why is it not actionable is all I'm asking you. Well, for several reasons. What is your reason why it's not actionable? It's not actionable, first, because it's not false. Second, because there's clearly no scienter alleged. And third, because loss causation doesn't establish a connection between that statement being supposedly fraudulent and a subject of discussion. So you're not claiming that it's not actionable just because it's an opinion? That's one of the reasons. I mean, there's a description. I asked you for your reasons, and you gave me your reasons, and I didn't think that was one of them. Well, it's not a misstatement. Implicit in the first that it's not a misstatement is that it's a general description of an opinion. So it's not a representation about a specific number. He did not say, we have recruited 450 people when the truth — What if they had alleged that there was an internal email saying that they were not reaching their recruiting goals? That's not what he said, though, the public statement. But what if they had alleged? Would that be sufficient? I don't think so. Why? Because the statement is not that we are reaching our goals. The goals may have been much higher than what they needed in order to reach the right level. What he stated was that they're reaching about the right level, given all the things that were going on. But the goals they internally set could be much higher than what they needed to reach the appropriate level. And what he did is he then explained the context that the challenges that they were confronting were not simply a question of the initial recruitment, but retention through the training process. But so if there was an email saying that they were to each other, we're not reaching what we want to here, that would make this actionable? You would have to see exactly what the allegations are. But that would come — that would certainly come closer. But that's not what was actually said. And that's not the allegations of the complaint. So I guess what I'm trying to tease out is the — is the gist of your argument here that this is immaterial or that it's an opinion? I'm still not sure what your answer to that question is. I think it's both, Your Honor. He said that we are reaching that — I'm trying to find the exact language. We are reaching the appropriate level. We feel that we're at the right rate for recruiting. Thank you. Thank you. We feel. That is the key language, that he is expressing his management. And he also says we're now reaching. Right. Right. So he's expressing a management judgment about a process that had been taking place throughout the year, and they were then reaching the right level for this initial stage of the process, the initial recruiting process. He then explained that the initial recruiting was really no longer the big problem. The big problem was retention through the training process and getting them to the point that they were productive at the level that they could be productive after. But he's also saying that neither of those is a big problem. Right? And the challenge statement, no, Your Honor. In the challenge statement, he's talking about we're now reaching the number of recruiting. Right. So nothing is a big problem for us with recruiting. To the contrary, the statement in context explains that they had confronted significant problems in this retention. Yeah, but they don't have them now. No. Respectfully, Your Honor, in the November statement, he says that recruiting is no longer a significant problem. We're reaching about the right level. The problem we have had, including the problem that they still had, was the problem of retention through the training process. We feel that we're at the right rate for recruiting, and we feel that we just need to keep it going for the foreseeable future. Right. So the recruiting is the initial process. It sounds to me like he thinks that the things are okay now. The initial process — Maybe this isn't actionable, but — Yeah, the initial process is recruiting people to begin with. I understand that. The second process is training — Retaining. Training those people and retaining. Yes. And the challenge statement is a statement about recruiting. The full context of the discussion that follows talks about the problems that they were confronting with retention and with training. So I don't think it's misleading at all. Certainly, it's not the kind of statement that is the basis to conclude that there's scienter. These minor expressions of judgment about whether they're reaching the right level of recruiting or not, coupled with an expression or an explanation about what the entire process involved. This is not the kind of statement that this Court has found to be indicative of scienter. This is the kind of statement that the Court has repeatedly found represents management judgment, expressions of opinion, and the kind of soft optimism that is not the kind of statement that is material within the context of the securities market. The other thing that I would point to is that Mr. Dubbs made much of this 500 number. It's very important for their claims. But importantly, the complaint actually never even alleges that only 500 people transferred. The complaint never alleges that. What the complaint alleges is that there was this newspaper article, The Guardian, which explicitly said that there's roughly an extra 1,000 people that we'll recruit, bringing the total to around 1,500. And then the complaint also cites to the February – this is page 74 of the appendix – cites to the February 3, 2016 hearing, which Judge Motz, I think, was what you were reading from. Right. But it was the page before that that actually has, I think, what is a problem for them, where the witness, Leslie Wolf, is questioned. And she says, right now, we're at about 1,200 or 1,250. That is about the number we need, about 1,200 full-time to clear the year two contract. Yeah. Now, that's the number, the full all-in number after recruiting and retention. Right. And retention. If you look at page 475 and 476 of the appendix, this is the transcript of the hearing. Yeah. What you'll see is that David Haley, who was the ATOS representative, the former contractor that Maximus took over from. Right. And he explains that they transferred 748 full-time employees. Right. What's followed then on the next page is Leslie Wolf is asked, and she says, yes, we did attract the right number initially, but they weren't staying. So the notion of 500 is really just an argument that's sort of taken the front of the stage through the course of argument. It's not actually even an allegation in the complaint. It's, at best, an inference that possibly could be drawn from the newspaper article. But as this Court has done, for example, in the Phillips case from the 90s, and I believe the McGuire and Matrix Capital case, the Court's not required to accept those characterizations and those inferences, even for purposes of figuring out whether the statement was false. To the contrary, you strip out characterizations that aren't the core facts and analyze the facts themselves. Certainly, for purposes of scienter, what you have is, at most, a situation of stacking an inference upon an inference for purposes of imputing some state line to someone, and the Court has been explicit that you cannot do that in the McGuire case. So can you explain to me a little bit about what this testimony is before Parliament? What kind of thing is this? Right. This is a, it's a, it would be the equivalent of something like that. A hearing? Yeah, it's a hearing, a Parliamentary hearing in which the Parliament was examining the assumptions that the Administration used, the U.K. Administration used for purposes of the contracting, and how the contracting had gone through the first year of the contract. And so they were examining how this process had played out, this process of initial transfer, recruiting more, training them, getting them productive. And so when they talk about the Comptroller and the Auditor General there, in what capacity are they? Are they part of this committee, or? My understanding, I don't, I couldn't swear to the details, but my understanding is that it's similar to the General Accounting Office in the United States Government. Yes, but if you had, for example, this was a Congressional hearing, you'd have the Senators or the Congress people, then you'd have a bunch of staff. Are these people staff, or are they part of the group, the Public Accounts Committee? I think they're not a committee, they're not a part of the Government Committee. My understanding is that they're an agency that's independent of the Congressional, the equivalent of a Congressional committee. Really, that isn't, I just was curious. Sure. Sure. Mr. Dubs didn't spend a lot of time on loss causation, but I do think it merits a point. The Cattile case, if I've pronounced it right, and I don't know that I have, is significant, because in that case, the disclosures that were pointed to as doubt, that throughout the course of the class period, there were several instances when there were problems that arose in the course of trying to get the regulatory approvals in order to complete the transaction that was at question. And the court said that that's fine, that these disclosures may have disclosed that there were reasons to doubt throughout the course of the class period that the transaction would be consummated. But what the disclosures did not do is indicate a reason to conclude that the statements that were made were fraudulent. That is, that the issuer at the time had already concluded during the course of these challenges that the transaction wouldn't go through. And they said that that was necessary for loss causation, because the loss causation is a situation where adverse events or negative news that reflects disappointing performance is turned into the basis for a securities fraud claim. What is needed is not just adverse market events, including failure to meet projections. What is needed is something that ties back, ties the disclosure, the corrective disclosure, and shows that they were, in fact, misstatements at the time they were made. Not that they just turned out to be wrong, not that they just turned out to be overly optimistic when made, but that they were fraudulent or reckless, which is a species of intentional misconduct at the time that they were made. And I don't think that the corrective disclosures in this case do that. They merely disclose disappointment relative to the optimism that the company's management had throughout the course of the class period. So I think that Judge Trengel was correct in truly killing the case. There are some plants that are not crops but are weeds, and this is one of those cases. And the PSLRA in particular was intended to authorize and require courts to weed out cases that did not present at the threshold a strong basis to conclude that fraud had occurred. The cases are supposed to be weeded out before they can even get to discovery, and Judge Trengel recognized the obligation to do that. And I believe this Court's cases, certainly on the Sientra front, but also on the loss causation front and on the searching inquiry about whether the statements alleged were even false, reflects that understanding that's consistent with Congress's intent in enacting the securities laws in the PSLRA and the Supreme Court's decisions that show that the courts need to act as gatekeepers, so to speak, to prevent securities fraud cases from proceeding without a strong basis. And if there are no other questions, I'd be happy to yield the rest of my time. I think we're fine. Thank you very much. My colleague covered a lot, but let me start with the point that he tried to drive home, which is that this Court's decisions on Sientra make this not a candidate for a strong inference for Sientra. The first thing one has to remember is that the securities laws were designed to have full disclosure to all investors. And if you do that and you're reckless in doing that, then there is liability. There's civil liability. You don't go to the electric chair. There's civil liability. So coming out and parading out some of the worst cases where there are restatements and awful conduct isn't really a test of anything. If every case has to be a Bernie Madoff case, there will be no securities laws. And that's the problem that it's raising. Securities cases are pretty hard to prove, pretty hard to plead, even. They are. Let's be clear about that. There's no question that the PL Cell Array raised the bar substantially, but it's also important to understand where they didn't raise the bar that high. They raised the bar on Sientra, but at the same time they also said, Justice Ginsburg also said, you have to take all the allegations of the plaintiff and take them as true and then compare them to other possible scenarios. So, for example, looking at something we never pled, we never talked about, this guy, Mr. Haley, and his testimony, that's rank air. It shouldn't even be looked at. Now, you can look at what we allege and come up with it and say it's not enough. You can say access isn't enough. You can say it's okay if Caswell is sitting there. He's about ready to go on to a conference call. He could call Leslie Wolf and double-check the information, and he didn't, and that's okay. You can say that's okay. You can also say that's not Bernie Madoff. We agree. But it is shows reckless conduct and something that should not go on. As to 1,500 and 1,000, we plead 1,500 and 1,000 based upon the Guardian article in the complaint, subtracting 1,000 from 1,500 is arithmetic. It's not an inference with all due respect to my colleague. As to the Omnicare question, if we look at Justice Kagan's decision on page 1329, she says in part, Key, the investor expects not just that the issuer believes the opinion, however irrationally, but that it fairly aligns with information in the issuer's possession at the time. That means these numbers. Thus, if a registration statement omits material facts about the issuer's inquiry into, or, and the or is important, or knowledge concerning a statement of opinion that is actionable, and that's the omissions part of Omnicare, not the misrepresentation part of Omnicare, which has a series of different tests. So these statements do not fall because of Omnicare. Now, as to loss causation, I would respectfully ask you to look at what the analysts say. That's the best evidence of what the market thought at the time and what was going on and why they thought the stock dropped. And you will find they say the stock dropped because they were having problems in volume because they didn't have enough people or in recruiting because they hadn't recruited and so on and so forth. So there are reasons for it to drop. The suggestion that you have to flagellate yourself in public and disclose the quote-unquote fraud isn't the case. You have to, the securities laws are about facts. And if facts come to light that had not been disclosed and as a result of that the market goes down, that is enough for loss causation. So let me just check my notes. A footnote, when she said 1,200 not a problem, she was talking about in year two. What we were talking about with 1,000 was the first year getting started. It's a nit, but it came up in the call. For those reasons, I, oh, let me make one more comment. And then I see the red light's on and you're being very patient. I'll make one comment and sit down and shut up. If for any reason you find that Mr. Montoni or Mr. Caswell were not reckless, and we are arguing they were reckless, we are not saying they're Bernie Madoff, then you have to reach the issue of corporate scienter. There is no question, no question that Leslie Wolfe in London was all over this contract. She knew everything about recruiting, everything about levels, and she was the principal interface with the British government on this. Her scienter is imputable to Maximus for all the reasons we said in our brief. Thank you for letting me go over. I appreciate it. Thank you very much. We will ask our clerk to adjourn court, and then we'll come down and say hello to the lawyers. This honorable court stands adjourned until 2.30 p.m. this afternoon. God save the United States and this honorable court.
judges: Diana Gribbon Motz, Robert B. King, Stephanie D. Thacker